BILAL A. ESSAYLI
United States Attorney
CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division
KERRY L. QUINN (Cal. Bar No. 302954)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-5423
    Facsimile: (213) 894-6269
    E-mail:   Kerry.L.Quinn@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:24-CR-725-ODW |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | |
| JULIE ANNE DARRAH, | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney and Assistant United States Attorney Kerry L. Quinn, hereby files its sentencing position for defendant JULIE ANNE DARRAH.

    This sentencing position is based upon the attached memorandum of points and authorities; the files and record in this case; and

//
//
//
//

such further evidence and argument as the Court may permit at the hearing on defendant's sentencing.

Dated: May 16, 2025

Respectfully submitted,

BILAL A. ESSAYLI
United States Attorney

CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division

     /s/
KERRY L. QUINN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................1

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.   INTRODUCTION...................................................1

II.  STATEMENT OF FACTS.............................................1

      A.   Background..............................................1

      B.   Defendant's Theft of Her Clients' Assets................2

      C.   Business Victim 1.......................................2

      D.   Interstate Wires........................................2

      E.   Losses & Victims........................................2

            1.   M.S.................................................3

            2.   B.C. (deceased) / friend D.R.:......................4

            3.   S.S. / C.S. (son):..................................6

III. ARGUMENT.......................................................7

      A.   Advisory Sentencing Guidelines..........................8

      B.   Analysis of the § 3553(a) factors.......................8

IV.  CONCLUSION.....................................................9

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant JULIE ANNE DARRAH ("defendant") committed a horrible, monstrous crime.  While running an investment advisory business, she stole her elderly clients' life savings, leaving some victims without money to pay for end-of-life care and depriving others of the opportunity to live out their lives with dignity and independence.  She preyed on elderly victims' desire for human connection, convincing them they could trust her like a daughter, and she then abused that trust and stole their money.  Some of her victims became depressed and stopped interacting with the world, losing their faith in humanity and will to live.  This is a heart-wrenching, devastating case, and there is no happy ending.  Defendant deserves a lengthy prison sentence and no mercy from this Court.

**II.   STATEMENT OF FACTS**

The relevant facts are stipulated in the plea agreement and in the Presentence Investigation Report ("PSR") as revised on May 13, 2025 (CR 30).

   **A.   Background**

At all relevant times, defendant ran an investment advisory business called Vivid Financial Management Inc. ("VFM"), and through this business she provided investment advisory services to clients.  VFM was an SEC-registered investment advisor, and from 2015 to 2021, defendant was the president, chief compliance officer, and one-third shareholder of VFM, and at all relevant times, defendant was an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).

### B. Defendant's Theft of Her Clients' Assets

Between 2016 and 2023, defendant stole approximately $2.25 million from her clients, nearly all of whom were elderly and at least some of whom were receiving end of life care. Defendant took advantage of these victims' vulnerable circumstances – stealing money from individuals who were least able to protect themselves or recover from their losses. Defendant executed the scheme by gaining control of clients' assets, liquidating securities holdings they had, and stealing the proceeds and other money in her clients' accounts for herself.

### C. Business Victim 1

Defendant also defrauded another SEC-registered investment advisor ("Business Victim 1") in connection with the sale of her business to Business Victim 1, causing Business Victim 1 to lose approximately $5.4 million.

### D. Interstate Wires

In executing the fraudulent scheme, defendant caused the transmission of numerous interstate wires, including a $90,000 interstate wire identified in the plea agreement and information.

### E. Losses & Victims

In total, in the course of and in furtherance of the fraudulent scheme, defendant caused approximately $7.7 million in losses and substantial financial harm to at least one victim.

The victims were devastated by defendant's criminal conduct. Not only did they lose their life savings, they lost their trust in humanity and were left to die without money for end-of-life care and in some cases without the will to go on, as some surviving family

members report.  Below are some excerpts from some of the victim impact statements, representing the devastation defendant caused:

    1.   <u>M.S.</u>

The defendant's actions have had a devastating impact on me, financially, emotionally and physically. . . .

I was financially secure and was planning on living out my final years independently in my home. The defendant, who was in charge of my finances, always reassured me that I had more than enough money to stay in my home.

In September 2023, my life was turned upside down with one call. The call was from the SEC and said that the defendant was being investigated for embezzling funds and believed I was affected by it. . . .

After a couple months, it became apparent that I would no longer be able to afford my home or stay in California. We decided it would be best to relocate to Minnesota to be close to my Son and family. The only choice was to make the drive back to California where we had an Estate sale to sell all my belongings and my home. I downsized from an 1800 ft sq home to a 700 sq ft Senior Apartment.

This was the hardest time in my life. We spent two months in California as I watched all my belongings being sold, including my home. There were people in and out of my home. Watching all of my possessions leaving my home as I no longer had room for them. I would ask my Son why I couldn't just buy my home back, to which I was told that I could no longer afford it as my money was all depleted by the defendant. That was the most stressful two months for all of us as this was not something any of us was expecting. They had to console me on some of my darkest days. Saying goodbye to my family and

friends knowing I would never see them again and driving the four days back to Minnesota was extremely difficult both physically and emotionally.

I was in denial that my money was really gone. I never in a million years would have believed that the defendant could do this to me.

I was and still am scared. Scared that someone would come after me for more of money. I now sleep with a chair blocking my door so that no one can break in. . . .

I was ashamed and feel guilty that I let this happen. I feel frustrated over the whole situation.

I'm sad and angry.

I have serious trust issues. I no longer trust anyone, especially when it comes to money.

I stress about money every day. I worry about not having enough. I worry about being dependent on my family both financially and physically. . . . I still very much miss my life in California. I miss my friends, family, home and mostly my independence.

My days now are spent in my apartment in front of the TV most of the day and I look forward to bedtime. I no longer have the desire to socialize or meet anyone new.

My heart is starting to fail and I've made the decision not to take any measures to prolong my life. This was not the quality of life I envisioned for my final years. . . .

    2.   <u>B.C. (deceased) / friend D.R.:</u>

I write this to express the profound impact that the actions of Julie Darrah had on my dear friend, [B.C.]. Julie used the guise of friendship to take advantage of a vulnerable elderly woman who

4

trusted her and considered her "a sister of the heart." This was not just a financial crime; it was a deep betrayal of trust and kindness. The emotional toll of this betrayal was immeasurable.

[B.C.], . . . a legendary educator and feisty woman, fell into a deep depression as a result of what happened. The weight of the deceit, combined with the stress and anxiety that followed, took a severe toll on her health.

Immediately following the revelation of Julie's actions, [B.C.]'s health began to deteriorate rapidly. She stopped taking her daily trips to Jack in the Box to pick up breakfast, a routine she once enjoyed. She canceled lunch dates at her favorite restaurant, Olive Garden, and we couldn't get her out of the house even to attend my children's sporting events, which always brought her such joy.

[B.C.] was embarrassed and ashamed that she had been taken advantage of and did not want to be seen in public. The only time I could get her out of the house was for the various appointments necessary to untangle the mess that Julie Darrah had created. I also took her to doctor's appointments, where she was prescribed antidepressants—then more antidepressants, as her mental health continued to decline. [B.C.] stopped driving in November and isolated herself from the world.

Unfortunately, [B.C.] did not have the strength to overcome the emotional devastation she felt. She became bed-bound and suddenly needed 24-hour care. She was hospitalized several times. Tests resulted in no conclusive diagnosis, despite her ongoing symptoms. Brenda passed away just months later, and I believe Julie Darrah's actions are the absolute cause of her rapid decline. One of the

significant conditions listed on the death certificate is major depressive disorder.

The loss of [B.C.] has left a hole in my heart and in the lives of those who knew her. It's impossible to describe the pain of seeing someone you care about suffer, and in this case, it was because of someone else's greed and disregard for their well-being.

3. <u>S.S. / C.S. (son)</u>:

Julie Darrah stole my mom's life savings and put her life in danger. I believe that the shock of this monstrous betrayal by a dear trusted friend pushed her deeper into dementia. Julie stole more money from my mom than from any of the other victims. . . .

Before I learned of the SEC lawsuit against Julie Darrah and the evidence they had of her monstrous crimes, I would have told you that Julie is the most trustworthy person I know! She had masterfully manipulated my feelings of trust, and thus my judgement. The same was true of my entire family, my mom's assisted living facility, her bank, her sister, her friends, and of course, my mom herself. Everyone I knew trusted Julie Darrah as a kind, thoughtful person who went out of her way to help elderly people who lived far from their families. . . .

The SEC investigation shows that, after selling my mom's house, Julie then drained all of my mom's accounts, stealing her life savings and the proceeds from selling her house. Julie laundered the money through a trust account and then transferred the money into her own personal account.

As the events were happening, we suspected nothing. But, in retrospect, the pattern was clear. Julie was systematically liquidating my mom's assets and working her way into having complete

control of my moms' life – finances, assisted living, health care, everything.

At the height of it, Julie even tricked the memory care facility into giving her the power to prevent me and my family from visiting my mom!

Julie also changed the Trust to make herself the sole beneficiary!

I believe my mother's dementia was triggered by Julie pushing her into assisted living when it apparently was not needed. Later, my mom had the further shock of learning that her dear, trusted friend stole all of her money.

When law enforcement apprehended Julie, my mom's accounts had all been drained, so her memory care facility could no longer be paid. This has caused my family extreme anxiety, since we were not certain whether the faculty could evict my mom for not paying her rent.

My mom owes her memory care facility an increasing amount of debt, which has reached $120,000. The facility has been pressuring me to pay, but my family can't afford it. . . .

Julie Darrah is not just guilty of fraud. She is guilty of methodically taking control of my mom's entire life and then putting my mom's life in danger by stealing all the money needed to provide for essential memory care. Further, I am convinced Julie's actions triggered my mom's dementia and then accelerated her deteriorating condition.

**III. ARGUMENT**

The government recommends that defendant be sentenced to a term of at least 121 months imprisonment.  The government also asks that

7

restitution be ordered in an amount to be determined at a separate restitution hearing.

### A. Advisory Sentencing Guidelines

Based on the facts outlined above and the stipulations in the Plea Agreement, as will be amended to correct the error the PSR identified in the parties' guideline calculation, the government submits that the following advisory sentencing guidelines apply:

| | | |
|---|---|---|
| Base Offense Level: | 7 | USSG §§ 2X1.1, 2B1.1(a)(1) |
| Fraud loss is greater than $3,500,000 but less than or equal to $9,500,000 | +18[1] | USSG § 2B1.1(b)(1)(K) |
| Substantial financial harm to one or more victim | +2 | USSG § 2B1.1(b)(2)(A) |
| Sophisticated means | +2 | USSG § 2B1.1(b)(10)(C) |
| Investment advisor enhancement | +4 | USSG § 2B1.1(b)(20)(A) |
| Vulnerable victims | +2 | USSG § 3A1.1(b)(1) |
| Total Offense Level | 35 | |

This guideline calculation is consistent with the guideline calculation in the PSR.

### B. Analysis of the § 3553(a) factors

The government submits that a sentence of at least 121 months is necessary to comply with the sentencing goals set forth in 18 U.S.C. § 3553(a).

---

[1] The PSR pointed out the mistake in the parties' guideline calculation; the parties have agreed to amend the Plea Agreement to correct the mistake.

The factors to be considered when imposing sentence, as set forth in 18 U.S.C. § 3553(a), include:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant . . .

(3) The kinds of sentences available;

(4) [the applicable sentencing guidelines];

(5) [the applicable sentencing guidelines policy statement];

(6)  The need to avoid unwarranted sentence disparities among defendants who have been found guilty of similar conduct; and

(7)  The need to provide restitution to the victims of the offense.

18 U.S.C. § 3553(a) (emphasis added).

The statements of the victims speak for themselves in this case. Defendants' conduct was brutal, manipulative, and despicable. She deserves no mercy from this Court, and a sentence of at least 121 months.

**IV.   CONCLUSION**

For the reasons set forth above, the government recommends that defendant be sentenced to a term of imprisonment of at least 121 months, a three-year period of supervised release, and ordered to pay restitution in an amount to be determined at a separate restitution hearing to be scheduled at the sentencing hearing.

9